(No. 66245.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SHERMAN GIBSON, Appellant.

*Opinion filed May 30, 1990.*

Charles Schiedel, Deputy Defender, of Springfield, and Steven Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Sherman Gibson, of Pontiac, appellant *pro se.*

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and David E. Bindi, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Will County, the defendant, Sherman Gibson, was convicted of murder. The defendant waived his right to a jury for purposes of a capital sentencing hearing, and the trial judge sentenced the defendant to death. The defendant's execution was stayed pending direct review by this

court. Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d Rules 603, 609(a).

Leon Smallwood, an inmate of Stateville Correctional Center, was found in his cell on October 15, 1985, dead of a stab wound. The defendant and two others, Robert Lofton and Vernon Hicks, all inmates of Stateville, were charged jointly with Smallwood's murder. The defendant was later granted a severance and tried separately. The defendant's first trial ended in a hung jury, but the defendant was convicted of the offense in a second trial. The defendant chose to appear *pro se* on both occasions. Following the defendant's conviction, counsel was appointed at the defendant's request to represent him during the remainder of the proceedings. The defendant was found to be eligible for the death penalty and, at the conclusion of the sentencing hearing, the trial judge sentenced the defendant to death. Lofton also was convicted of Smallwood's murder, and he received a sentence of natural life imprisonment; the charge against Hicks was eventually dismissed on the State's motion. The present appeal relates solely to the defendant's conviction and sentence.

The chief prosecution witness at the defendant's trial was Larry Eckstine, an inmate of Stateville at the time of the offense. Eckstine testified that on October 15, 1985, he went to breakfast with fellow inmate Festus Brown between 6:30 and 6:45 a.m. After the meal, Eckstine and Brown returned to Brown's cell, located on the fourth gallery, or tier, of the cell house. In need of a light for his cigarette, Eckstine went next door to Smallwood's cell. There, Eckstine saw Smallwood, the defendant, Robert Lofton, and a fourth person, whose name Eckstine did not know. Eckstine asked for a match, and Lofton told him that they were busy. Eckstine later heard what he described as "thumping" noises coming from Smallwood's cell. The sounds lasted

about three minutes, and afterwards Eckstine saw Lofton and the fourth person, but not the defendant, leave the neighboring cell. Eckstine estimated that the events he described occurred at 7:10 or 7:15, before the morning count of inmates was taken. At the time of trial, Eckstine was on parole from convictions for theft and aggravated battery; he stated that he had not received anything in exchange for his testimony in the present case.

On cross-examination, Eckstine acknowledged that at the defendant's first trial he testified that he had not seen the defendant in Smallwood's cell on the morning of the murder. Eckstine explained that the defendant's appearance was different at the first trial because the defendant was not then wearing glasses. Eckstine also stated that at the first trial the defendant made certain motions or gestures with his hands during Eckstine's testimony.

Another inmate, Henry Burrell, testified that he saw the defendant, Lofton, and a third person enter Smallwood's cell on the morning of October 15. At the time, Burrell was standing on the ground floor of the cell house and was looking up toward gallery 4. In addition, Burrell testified to an encounter he had with the defendant in a holding cell in the Will County courthouse in November 1986, during the defendant's first trial. On that occasion, the defendant asked Burrell to take to Robert Lofton, also charged with Smallwood's murder, copies of Eckstine's testimony implicating Lofton. Burrell also testified that the defendant on the same occasion offered to pay him $1,000 if he would harm inmate Festus Brown. At the time of trial, Burrell was serving a term of imprisonment for murder, and previously he had been convicted of aggravated battery and robbery. Burrell declared that in exchange for his testimony in the present case the State had agreed to drop a charge

of aggravated battery and to help him enroll in correspondence classes.

The State presented additional testimony concerning the defendant's activities on October 15, 1985. A correctional officer saw the defendant and Smallwood in Smallwood's cell around 7:15 or 7:20 that morning. The defendant was sitting on a crate, and Smallwood was lying on a mattress on the floor, with a sheet pulled up to his neck. The officer did not notice anything unusual at the time, but the cell was dark and the officer was using a flashlight. Shortly before 8 o'clock that morning, the defendant appeared in a ground-floor office in the cell house and requested a screwdriver. The defendant had a bandage on his lip, and he explained to the two officers who were present that he had cut his lip in a fight. One of the officers had seen the defendant the preceding day and had not noticed the injury at that time.

After the completion of the morning count on October 15, the inmates on gallery 4 were released from their cells shortly after 8 o'clock. There was no response at Smallwood's cell when a correctional officer asked whether the occupant wanted the door unlocked. At that time, a curtain covered the door, and the officer could not see the interior of the cell. The victim's body was discovered by correctional officers around 8:30 a.m., when inmate Festus Brown reported that medical assistance was required in Smallwood's cell. Smallwood had been stabbed in the chest, and he was pronounced dead at the scene. According to the autoptic evidence, the cause of death was a stab wound to the heart. The autopsy also revealed that Smallwood had sustained a number of other injuries to his head and torso.

The defendant was questioned several times concerning Smallwood's murder. On October 15, the defendant told an investigator that during the morning he went to breakfast, made a telephone call to his mother, and then

went to a cell on gallery 2 of the cell house. The defendant denied having any knowledge of the incident. The defendant admitted that he was a member of a gang known as Metro East. About six weeks after the initial interview, the defendant provided a slightly different account of his activities. On that occasion, the defendant stated that after breakfast he went to Smallwood's cell to retrieve some of his belongings, took the items to a cell on gallery 2, and then called his mother. At trial, the State introduced evidence that blood consistent with Smallwood's blood type and inconsistent with the defendant's own type was found on clothing worn by the defendant on the morning of the murder. Using records of the telephone service at the East St. Louis home of the defendant's mother, the State presented testimony indicating that Mrs. Gibson received a three-minute call from Stateville at 8:38 a.m. on October 15, 1985.

The State also introduced evidence of a possible motive for Smallwood's murder. Thomas McWilliams, head of the internal investigation unit at Stateville, testified as an expert witness on gang activity at that institution. McWilliams said that the gang to which the defendant belonged, Metro East, consisted primarily of inmates from the St. Louis and East St. Louis areas and was centered at Menard Correctional Center. McWilliams estimated that in October 1985 the Stateville membership of that group consisted of no more than six persons, including the defendant, Robert Lofton, Vernon Hicks, Festus Brown, and Leon Smallwood. McWilliams explained that gangs operating at Stateville are loosely divided into two rival alliances, and McWilliams testified that there was evidence that Smallwood had been interested in switching his allegiance to a different gang, under the rival alliance. McWilliams noted that Smallwood, at the time of his death, had in his cell a photograph of a person whom inmates associated with the other gang.

McWilliams explained that the loss of a single member could be significant to a small gang like the defendant's.

The defendant presented several witnesses in his own behalf, but he did not take the witness stand himself. Testifying as a defense witness, Stateville inmate Festus Brown denied that he was with Larry Eckstine on the morning of October 15, 1985. Brown also stated that he did not see the defendant on gallery 4 of the cell house that morning. On cross-examination, Brown was impeached with various inconsistent statements he had previously made to investigators in this matter, and in rebuttal the State presented further impeaching evidence. Carlos Vega, present in the courthouse holding cell in November 1986 with Burrell and the defendant, testified that he did not see the defendant display any documents to Burrell or hear the defendant refer to Festus Brown or offer Burrell money. The defendant's mother testified that the defendant called her at her home on October 15, 1985, between 7:30 and 8 o'clock that morning and that their conversation lasted 15 minutes or longer. A member of the organization whose founder Smallwood had pictured on his cell wall stated that his group was a legitimate religious organization and denied that it was associated in any way with gang activity. Inexplicably, the defendant also called Larry Eckstine to testify. Eckstine stated that he was with Festus Brown on the morning of October 15, and he recalled seeing the defendant on gallery 4 on that day.

The trial judge sustained the State's objections to the testimony of several witnesses called by the defendant. The defendant attempted to present the testimony of correctional officer Kenneth Lee concerning an attack on inmate Smallwood at Stateville in July 1985. The defendant explained that he wanted to show that other inmates might have had a motive to kill Smallwood because Smallwood later identified his assailants to authorities.

Also, the defendant had assisted Smallwood on that occasion and may have bloodied his clothing at that time. Although the same testimony was admitted during the defendant's first trial, on this occasion the judge sustained the State's objection on the ground that the information was remote in time and therefore irrelevant. The defendant also called two of his nephews as witnesses. The defendant proposed to show that he had counseled the nephews against joining gangs. The trial judge sustained the State's objections to their testimony.

The jury found the defendant guilty of Smallwood's murder. At the defendant's request, the trial judge later appointed the public defender to represent the defendant during the course of the sentencing and post-trial proceedings. The defendant was found eligible for the death penalty because the murder victim was an inmate of a correctional facility and "was killed on the grounds thereof" (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(2)). In the latter part of the sentencing hearing, the State introduced evidence of the defendant's criminal history and of his disciplinary record while a prisoner. Following arguments of counsel, the trial judge sentenced the defendant to death.

The defendant raises a number of arguments challenging his conviction and death sentence, but we find one matter to be dispositive of the present appeal. That issue concerns the appointment and later withdrawal of standby counsel to assist the defendant in the present case. The public defender of Will County was originally appointed to represent the defendant. During a hearing on June 30, 1986, the defendant made an oral motion to represent himself in this matter. On that occasion, the following colloquy ensued:

"THE COURT: Mr. Gibson, have you ever had any law training of any kind?

DEFENDANT GIBSON: No sir, not a criminal. But I studied Federal law a lot.

THE COURT: You have been studying a lot?

DEFENDANT GIBSON: Yes, sir.

THE COURT: You know all the problems in representing yourself, don't you?

DEFENDANT GIBSON: Yes, sir. I am well aware of the fact that it is going to be some kind of problems representing myself, yes, sir.

THE COURT: I wouldn't say that there's never been a case that a man has not successfully represented himself. I just don't happen to know of any in my twenty-two years. And they always say when a man acts as his own attorney, he has a fool for a client. You know. That is an old saying they have. There's a lot of pitfalls. And in twenty-two years, I have never seen a successful defense by a person themself [*sic*]. But I imagine somewhere in the U.S.A. there's been somebody successful at one time.

You have a right to represent yourself, if that is what you want to do. I am going to grant you that right. And what I am going to do is I am going to appoint Mr. Irby [*i.e.*, the assistant public defender then representing the defendant] to assist you. All right?"

The defendant indicated his satisfaction with that arrangement.

Several months later, in October 1986, the public defender filed a motion requesting leave to withdraw as standby counsel. The public defender maintained that the applicable statute, "An Act in relation to the office of Public Defender" (Public Defender Act) (Ill. Rev. Stat. 1987, ch. 34, pars. 5601 through 5608), provided no authority for the appointment of his office in that capacity. The State did not oppose the public defender's request to withdraw as standby counsel. At the hearing on the public defender's motion, held October 6, 1986, the trial judge asked the defendant whether it was his wish to continue *pro se* and, further, advised the defendant that

standby counsel would not be available if he persisted in representing himself:

"THE COURT: If you want to be your own lawyer, I am going to let you be your own lawyer, and let you do things your way.

You will be the commander in chief. You will be the only captain of the ship. You will run the whole thing yourself. You have that right. And I am going to inform you that you have that right, if that is what you want to do, or you can have a lawyer represent you.

And in that classification, he will represent you.

Now, you have got your choice. And if you tell me today you want to be your own lawyer, I am not ever going to let you change your mind again.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: What do you like to do?

THE DEFENDANT: I would like to be my own lawyer.

THE COURT: Okay, sir.

Mr. Gibson, you are going to be your own lawyer. I will not appoint counsel for you. And I am going to discharge the stand-by counsel and give them leave to withdraw. And the stand-by counsel will be given leave to withdraw.

I am going to appoint no stand-by counsel, no standby. And you will be your own lawyer, sir. And you have made your mind up now, once and for all.

Is that right?

THE DEFENDANT: Yes, sir.

THE COURT: Okay, you and I understand each other?

THE DEFENDANT: Yes, sir, we understand each other on that issue.

THE COURT: On that issue.

THE DEFENDANT: Yes, sir."

The trial judge entered a written order granting the public defender's request to withdraw as standby counsel. The judge agreed with the public defender that the

Public Defender Act provided no authority for such an appointment. In his written order, the trial judge stated, "Section Four of the Public Defender[ ] Act limits the jurisdiction of the Court to appoint the Public Defender to act as attorney for the defendant. The defendant, persisting in his request to represent himself and to act as his own attorney, is not entitled to the services of the Public Defender as the legislature did not provide for appointment of stand-by counsel." Fortifying his interpretation of the Act, the judge also found that there were no other statutory provisions or constitutional provisions granting an accused a right to the assistance of standby counsel. Although the judge did not expressly find that he lacked discretion to appoint an attorney other than the public defender to assist the defendant as standby counsel, examination of the record compels the conclusion that the judge did not believe that he had that alternative. Having ruled that the public defender could not be appointed, the judge did not then go on to consider whether alternative sources of counsel existed. The judge's failure to make any reference to the availability or unavailability of other attorneys or to consider the appointment of alternative counsel suggests that he believed that he did not have discretion to appoint someone other than the public defender to that role.

The defendant's first trial began several weeks after the public defender was allowed to withdraw as standby counsel. In that proceeding, a mistrial was declared when the jurors were unable to agree on a verdict. The defendant was retried on the present charge in January 1987. At the outset of the second trial, the defendant reaffirmed his intention to proceed *pro se.*

Both the Federal and State Constitutions grant to an accused the right of self-representation in criminal proceedings. (See U.S. Const., amends. VI, XIV; *Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S.

Ct. 2525; Ill. Const. 1970, art. I, §8 ("In criminal prosecutions, the accused shall have the right to appear and defend in person and by counsel").) It has been held, however, that the appointment of standby counsel to assist a defendant who is proceeding *pro se* does not offend the Federal constitutional right of self-representation (*McKaskle v. Wiggins* (1984), 465 U.S. 168, 79 L. Ed. 2d 122, 104 S. Ct. 944; *Faretta*, 422 U.S. at 834 n.46, 45 L. Ed. 2d at 581 n.46, 95 S. Ct. at 2541 n.46), and we do not consider that such an appointment would violate the corresponding right of self-representation secured by our own State constitution. Moreover, there is no State statute or rule of court forbidding the appointment of standby counsel to assist a *pro se* defendant. Reserving for the moment the related question whether the public defender's office may properly be appointed to that function, we conclude that the trial judge had discretion to appoint standby counsel notwithstanding the defendant's decision to represent himself in the present matter.

In the proceedings below, the public defender requested leave to withdraw as the defendant's standby counsel on the ground that the Public Defender Act does not authorize such an appointment. Describing the duties of the public defender, section 4 of the Public Defender Act provides, in pertinent part:

> "The Public Defender, as directed by the court, shall act as attorney, without fee, before any court within any county for all persons who are held in custody or who are charged with the commission of any criminal offense, and who the court finds are unable to employ counsel." (Ill. Rev. Stat., 1988 Supp., ch. 34, par. 5604.)

Section 4 of the Act also authorizes appointment of the public defender in several other specified instances, none of which are relevant here. In seeking to withdraw as standby counsel, the public defender argued that his of-

fice would not, in the language of section 4, be "act[ing] as attorney" for the *pro se* defendant. The public defender thus believed that the circuit court was without power to appoint his office in those circumstances. In support of that contention, the public defender referred to this court's intervening decision in *Maloney v. Bower* (1986), 113 Ill. 2d 473, rendered after the challenged appointment was made. As we have stated, the trial judge agreed with the public defender's view of the statute and allowed the motion for withdrawal, once the defendant elected to continue *pro se.*

In *Maloney* the chief judge of a judicial circuit issued an order stating that counsel would be appointed pursuant to the Public Defender Act to represent indigent defendants in civil contempt proceedings that might result in the contemnor's incarceration. The public defender of a county in the circuit brought an original action in this court to prohibit the chief judge from enforcing the order. The public defender contended that the Public Defender Act did not permit the appointment of his office to represent indigent persons in civil contempt proceedings. This court agreed with the public defender and granted the requested writ of prohibition. The court concluded in that case that enforcement of the challenged order would have enlarged the public defender's duties beyond those specified by statute. Noting that "[c]ourts, when acting under the Public Defender Act, can make appointments only as the Act provides" (113 Ill. 2d at 479), the court held that the judge lacked statutory authority to appoint the public defender in those circumstances.

For the reasons that follow, we conclude that the Public Defender Act permits appointment of the public defender to serve as standby counsel for an accused who elects to represent himself in a criminal proceeding. Examination of the role that counsel may properly perform

in that capacity, without trenching on the *pro se* defendant's right of self-representation, persuades us that such counsel does, in the language of the statute, "act as attorney \*\*\* before [the] court" for the defendant. Because assistance in that manner falls within the range of duties specified by the Public Defender Act, the trial judge in the present case possessed the necessary authority to appoint the public defender to act as standby counsel for the defendant. Unlike the appointment order challenged in *Maloney*, appointment of the public defender in the present circumstances finds authorization in the Public Defender Act.

In *McKaskle v. Wiggins* (1984), 465 U.S. 168, 79 L. Ed. 2d 122, 104 S. Ct. 944, standby counsel was appointed to assist an accused who had chosen to represent himself. During the defendant's trial, counsel engaged in a number of activities on behalf of the defendant. Following his conviction, the defendant sought a writ of *habeas corpus*, contending that his Federal constitutional right of self-representation, as recognized in *Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525, had been violated by standby counsel's unsolicited participation at his trial. Rejecting the view of the court of appeals that the proper role of standby counsel is "' "to be seen but not heard" ' " (*McKaskle*, 465 U.S. at 173, 79 L. Ed. 2d at 130, 104 S. Ct. at 948, quoting *Wiggins v. Estelle* (5th Cir. 1982), 681 F.2d 266, 273), the Supreme Court ruled that the defendant's right of self-representation had not been breached in that case.

The Court in *McKaskle* examined the role that standby counsel may assume in assisting a defendant who chooses to represent himself. Consistent with *Faretta*, "the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury," and counsel's unsolicited participation "should not be allowed to destroy the jury's perception that the

defendant is representing himself." (*McKaskle*, 465 U.S. at 178, 79 L. Ed. 2d at 133, 104 S. Ct. at 951.) The Court did not believe, however, that the right of self-representation was infringed when standby counsel performed a variety of fundamental chores, whether in or outside the presence of the jury. Thus, standby counsel may assist a *pro se* defendant "in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete," and may also help "ensure the defendant's compliance with basic rules of courtroom protocol and procedure." (*McKaskle*, 465 U.S. at 183, 79 L. Ed. 2d at 136, 104 S. Ct. at 953-54.) The Court concluded:

"Accordingly, we make explicit today what is already implicit in *Faretta*: A defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel—even over the defendant's objection—to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals. Participation by counsel to steer a defendant through the basic procedures of trial is permissible even in the unlikely event that it somewhat undermines the *pro se* defendant's appearance of control over his own defense." *McKaskle*, 465 U.S. at 184, 79 L. Ed. 2d at 137, 104 S. Ct. at 954.

In light of the broad range of activities that standby counsel may perform, consistent with *Faretta*, in assisting a *pro se* defendant, we conclude that such counsel does, as section 4 of the Public Defender Act requires, "act as attorney *** before [the] court" for a defendant who is representing himself. Appointment of the public defender in that capacity therefore will not enlarge that office's duties beyond those prescribed by the Act. Ac-

cordingly, the trial judge in the present case was authorized by statute to appoint the public defender's office as standby counsel.

Having determined that the trial judge possessed both the discretion to appoint standby counsel to assist the *pro se* defendant and the authority to assign the public defender to act in that capacity, we now consider whether the defendant is entitled to a new trial in light of the public defender's eventual withdrawal from the case. Citing *People v. Queen* (1974), 56 Ill. 2d 560, the defendant contends that the trial judge's failure to exercise his discretion in this matter by continuing the appointment of the public defender's office as standby counsel automatically requires that the cause be remanded for a new trial. The trial judge in *Queen* refused a request made by the jury, during deliberations, for a review of certain testimony. It appeared that the judge believed that he did not have discretion to allow the request. This court ruled that the trial judge did in fact have discretion to consider the jury's request for a review of the relevant testimony. Although the court noted that error occurs "when a trial court refuses to exercise discretion in the erroneous belief that it has no discretion as to the question presented" (*Queen*, 56 Ill. 2d at 565), the court also suggested that the effect of such a failure to exercise discretion must be assessed in the context of the entire proceeding (*Queen*, 56 Ill. 2d at 565-66 ("Considering the circumstances here, we judge that the error was of such substance that the cause must be remanded for a new trial")).

For the reasons set out below, we conclude in the present case that the failure to appoint standby counsel would have been an abuse of discretion and, furthermore, that the trial judge's refusal to continue the initial appointment he made requires that the defendant be retried. Accordingly, we need not consider the defendant's

argument, based on *Queen,* that the trial judge's failure to exercise his discretion, without more, should necessarily require reversal of the judgment below. It is appropriate to observe, however, that the defendant's reliance on *Queen* may be questioned, as the earlier-quoted extracts from that case illustrate. Moreover, the utility of the defendant's suggested rule of automatic reversal is doubtful. For example, if it could be determined that the refusal to appoint standby counsel would not have been an abuse of discretion, there would be no purpose now in remanding the cause for further proceedings solely on the ground that the trial judge failed to exercise his discretion. See *People v. Crandell* (1988), 46 Cal. 3d 833, 864-65, 760 P.2d 423, 439, 251 Cal. Rptr. 227, 242 (where refusal to grant advisory counsel would not have been abuse of discretion, no reversible error in trial court's erroneous failure to exercise discretion and consider request for standby counsel); see also *People v. Flores* (1989), 128 Ill. 2d 66, 93-94 ("On this record it cannot be reasonably said that, even if the court did not consider it had discretion to make the transcripts [of trial testimony] available to the jury, the error had the effect of denying the defendant a fair trial").

Relevant criteria appropriately considered by a trial court in deciding whether to appoint standby counsel to assist a *pro se* defendant in a criminal case include the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant. (See *People v. Bigelow* (1984), 37 Cal. 3d 731, 743, 691 P.2d 994, 1000-01, 209 Cal. Rptr. 328, 334.) Consideration of these circumstances in light of the record in the present case leads us to conclude that the failure to appoint standby counsel to assist the defendant would have been an abuse of discretion. The charge on which the present defendant was standing trial was a capital offense. It may be noted that

standby counsel was appointed in each of the two prior capital cases in this State in which a defendant elected to represent himself during all or a portion of the trial court proceedings. (See *People v. Johnson* (1987), 119 Ill. 2d 119; *People v. Silagy* (1984), 101 Ill. 2d 147.) The prosecution's case against the defendant rested on a combination of forensic evidence, expert testimony, and the testimony of the defendant's fellow inmates. The record reveals that the defendant was 28 years old at the time of his second trial, had convictions from two prior occurrences, entered in 1980 and 1981, and had been in custody since 1981. Of particular significance here is the trial judge's original decision to appoint the public defender as standby counsel when the judge believed that he had the discretion and authority to do so. From what appears of record, the trial judge later allowed the public defender's motion to withdraw only because the judge considered then that such an appointment was not authorized by statute. The trial judge's initial decision reflected his view that appointment of standby counsel would be appropriate in the present case, and there is no indication that he later changed his mind in that regard. Taken together, these circumstances—the seriousness of the charge, the difficulty of the evidence, and the defendant's limited experience—indicate in the present case that the refusal to appoint standby counsel would have been an abuse of discretion.

Without determining here whether the erroneous refusal to appoint standby counsel is prejudicial *per se* and must in every case necessitate a new trial (see *People v. Bigelow* (1984), 37 Cal. 3d 731, 744, 691 P.2d 994, 1001-02, 209 Cal. Rptr. 328, 335 (adopting rule of *per se* reversal where it is shown that failure to appoint standby counsel was abuse of discretion)), we conclude that the defendant was prejudiced by the trial judge's failure to continue in force the appointment he was empowered to

make and that a new trial is therefore required. The prejudicial effect of the judge's erroneous ruling is apparent from a consideration of the trial proceedings. The State now concedes that its evidence regarding the time and duration of the defendant's telephone call to his mother was admitted without proper foundation. That evidence, which was not presented at the defendant's first trial and which was not challenged at the second, contradicted the defendant's key theory that he was on the telephone when the murder occurred. The defendant's handling of a number of matters during the proceedings should also be noted. His cross-examination of the State's witnesses was for the most part perfunctory. He pointlessly chose to call chief prosecution witness Eckstine to testify during the defense case in chief. The defendant also insisted on calling to the stand witnesses whose testimony the trial judge had already indicated, in rulings made outside the jury's presence, would not be admitted into evidence. Throughout the second trial the defendant repeatedly argued that his statutory right to a speedy trial had been violated, even though the trial judge had previously, and properly, as we show later, rejected that contention.

We cite these incidents not as proof that the defendant was denied the effective assistance of counsel—a claim that the defendant, having elected to represent himself, may not now make (see *McKaskle*, 465 U.S. at 177 n.8, 79 L. Ed. 2d at 133 n.8, 104 S. Ct. at 950 n.8; *Faretta*, 422 U.S. at 834 n.46, 45 L. Ed. 2d at 581 n.46, 95 S. Ct. at 2541 n.46)—but rather as an indication that standby counsel could well have assisted the defendant in a meaningful manner, with respect to a variety of matters that were apparent or could have been anticipated prior to trial. The jurors at the defendant's first trial were unable to agree on a verdict in the case, and

the resulting mistrial illustrates fully the closeness of the evidence in the case.

We do not intend to suggest by our present holding that the appointment of standby counsel is necessary in every case, capital or noncapital, in which an accused chooses self-representation. As we have seen, the right of self-representation does not carry with it a corresponding right to the assistance of a legal adviser; one choosing to represent himself must be prepared to do just that. Standby counsel, however, may be appointed to assist an accused who elects to represent himself. In the present case, the trial judge initially appointed the public defender to serve as the *pro se* defendant's standby counsel. The judge later allowed the public defender to withdraw from the case in the mistaken belief that the appointment was not authorized by statute. As we have determined, the judge possessed both the discretion to appoint standby counsel and the authority· to assign the public defender's office to that task. We conclude in the present case that the failure to make such an appointment would have been an abuse of discretion and, furthermore, that the trial judge's failure to continue the appointment he originally made requires that the defendant be retried.

Two issues remain for our consideration. First, the defendant contends that he was not proved guilty beyond a reasonable doubt and therefore may not be tried again for the offense. (See *People v. Taylor* (1979), 76 Ill. 2d 289, 309.) We do not agree with the defendant that his retrial is barred. In making that judgment we are permitted to consider all the evidence presented below, including that now challenged by the defendant. (See *Lockhart v. Nelson* (1988), 488 U.S. 33, 102 L. Ed. 2d 265, 109 S. Ct. 285.) The defendant was seen in Smallwood's cell by several witnesses around the time of the murder, and there was also testimony indicating that

the defendant was present during the commission of the offense. Blood consistent with the victim's type and inconsistent with the defendant's own type was found on clothing worn by the defendant on the morning of the murder. The defendant later gave different accounts of his activities during the period in question. There was evidence—which the State now concedes was admitted without proper foundation—indicating that the defendant's telephone call to his mother occurred after Smallwood's murder was discovered. In addition, there was testimony, also challenged by the defendant in this appeal, suggesting a possible motive for the murder. In light of the evidence presented below, we do not consider that retrial of the defendant is precluded on grounds of evidentiary insufficiency.

The defendant also contends, in the *pro se* supplemental brief he has submitted to this court, that his statutory right to a speedy trial was violated. The trial judge correctly rejected this argument when it was raised below. As the judge noted, the speedy-trial provision applicable to an accused committed to the Department of Corrections, such as the defendant, is found in section 103—5(b) of the Code of Criminal Procedure of 1963. (See Ill. Rev. Stat. 1987, ch. 38, pars. 103—5(b), 1003—8—10.) The provision allows a span of 160 days between demand for trial and the commencement of trial. That requirement was met in this case, and there was no violation of the defendant's statutory right. The defendant made his demand on June 30, 1986, and jury selection for the first trial began on October 29, 1986, well within the period allowed. Finally, the defendant alleges, in summary fashion, a violation of his Federal constitutional right to a speedy trial. The defendant has failed to support this assertion with any argument, however, and therefore we decline to consider it. See 113 Ill. 2d R. 341(e)(7); 107 Ill. 2d R. 612(i).

For the reasons stated, the defendant's conviction is reversed and his sentence is vacated. The cause is remanded to the circuit court of Will County for further proceedings.

*Reversed and remanded.*