2021 IL App (1st) 191710-U
Order filed: December 23, 2021

FIRST DISTRICT
FOURTH DIVISION

No. 1-19-1710

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CH 17747 |
| | ) | |
| ALFRED COPPAGE, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirmed the *pro se* defendant's conviction and sentence for unlawful use of a weapon by a felon, finding that the trial court erred in ruling that defendant opened the door to the admission of the weapon into substantive evidence but that the error was harmless given the overwhelming other evidence of defendant's guilt. The court committed no abuse of discretion in denying defendant's requests for standby counsel.

¶ 2    A jury convicted defendant, Alfred Coppage, who represented himself *pro se* at trial, of unlawful use of a weapon by a felon (UUWF) and the trial court sentenced him to nine years' imprisonment. On appeal, defendant contends that the court erred by: (1) finding that his questioning of a witness at trial "opened the door" to allow the admission of the weapon into

substantive evidence after it had previously been suppressed; and (2) denying his requests for standby counsel. We affirm.

¶ 3     Prior to trial, defendant advised the court that he wished to proceed *pro se* on the UUWF charge. The court admonished defendant pursuant to Illinois Supreme Court Rule 401 (eff. July 1, 1984) and specifically advised him of the nature of the charge, of his right to counsel, and that he faced a minimum of seven years' imprisonment due to his prior conviction for aggravated vehicular hijacking and a maximum of 14 years' imprisonment. The trial court inquired about defendant's background, and he stated that he was 36 years old and had completed two years of college. Defendant stated that he previously represented himself on a case in Iowa,[1] and that he had successfully argued for dismissal of the charges in that case. The trial court advised defendant of the advantages of being represented by experienced legal counsel, and then the following colloquy ensued:

> "[THE COURT]: I do have the discretion to appoint standby counsel. I have read the indictment. It appears to me that there's nothing particularly complicated about this case. Though I appreciate it's serious to you, it doesn't seem to me to be complicated. Therefore, in my discretion, I'm not going to appoint standby counsel, and I have not heard anyone request such. What do you wish to do at this time, Mr. Coppage, represent yourself or proceed with [defense counsel]?
>
> [DEFENDANT]: Well, I did ask [defense counsel] for standby counsel. He said he didn't want to do standby counsel.

---

[1] During a subsequent hearing on defendant's motion to suppress, he informed the court that he previously represented himself "two times in the court of law" and "won both times."

[THE COURT]: It's not up to him to be standby counsel or not be standby counsel. It's up to me to appoint standby counsel or not, and I am not. What do you wish to do?

[DEFENDANT]: I would like [to] exercise my right to represent myself."

¶ 4    The court accepted defendant's waiver of counsel.

¶ 5    Defendant filed a motion to suppress. At the hearing on the motion, Sergeant Jeremy Sikorski testified that on December 1, 2018, Amadou Mar, the owner of several apartment units at 6744 South Merrill Avenue in Chicago called police and stated that defendant was a squatter in apartment 2 South and had pulled a gun on him and on one of his employees, Moussa Soukouna. Sergeant Sikorski went to 6744 South Merrill Avenue and saw defendant, who the Sergeant mistook as the lessor of the apartment. Sergeant Sikorski asked defendant for consent to search the apartment. Defendant refused to give consent. Sergeant Sikorski then spoke with Mar, who showed him the lease indicating that Richard Lisewski was the lessor of the apartment. Sergeant Sikorski also viewed a cellphone video taken by Mar showing him arguing with defendant about being a squatter; in the video, defendant can briefly be seen pulling an object that appears to be a black handgun from behind his back. Sergeant Sikorski subsequently received written consent from Lisewski to search the apartment. Officers conducted a search and recovered a black semiautomatic handgun from a closet in a bedroom. Mar and Soukouna identified the gun as the same weapon that defendant had pulled on them earlier.

¶ 6    Officer Jennifer Dodge testified that she was dispatched to 6744 South Merrill Avenue on December 1, 2018, in response to a report of someone with a gun there causing a "disturbance." She was with Sergeant Sikorski when he received the consent to search the apartment from Lisewski. Officer Dodge then searched the apartment and discovered a black handgun in a closet in a bedroom.

¶ 7    The trial court permitted defendant to introduce into evidence a rental receipt from Tonia Ellis showing that she had paid $1350 for rent on the apartment and a ComEd receipt showing she made a utility payment for the apartment in November 2018. Although neither defendant nor Ellis testified at the hearing, defendant told the court while arguing the motion that Ellis was the mother of his daughter and that he lived with her in apartment 2 South. Defendant further informed the court that Ellis was Lisewski's granddaughter and that Lisewski permitted her to stay in the apartment and make the rental payments. Defendant then argued that since he was living in the apartment with Ellis, he had a right or expectation of privacy in the apartment and that the officers could not lawfully enter and search the apartment unless he gave them permission to do so. Defendant argued that since he never gave the officers consent to enter and search the apartment, their search violated the fourth amendment and the gun should be suppressed. Defendant further stated that he only had a "little fake gun" at the apartment on December 1, 2018, but that he did not possess the actual, real handgun recovered from the closet in the bedroom. Defendant contended he "shouldn't be liable" for the handgun found in the apartment which did not belong to him.

¶ 8    On April 15, 2019, the trial court denied defendant's motion to suppress the gun.

¶ 9    On May 21, 2019, the trial court *sua sponte* reconsidered defendant's motion to suppress based on the United States Supreme Court case, *Georgia v. Randolph*, 547 U.S. 103 (2006). In *Randolph*, the Supreme Court addressed whether a warrantless search based on one co-occupant's consent is valid if the other co-occupant, who later seeks to suppress the evidence, was present at the scene and refused to consent. *Id.* at 106. There, the defendant's estranged wife consented to a search of the marital residence after the defendant had refused to consent to the search. *Id.* at 107. The Supreme Court held that "a warrantless search of a shared dwelling for evidence over the

express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 120.

¶ 10    Here, the trial court found after reconsidering all the evidence and argument presented at the suppression hearing that defendant was a co-occupant of the apartment on December 1, 2019, with Tonia Ellis. The trial court also found that as a co-occupant of the apartment, defendant had an expectation of privacy thereto and that pursuant to *Randolph*, the officers violated his fourth amendment rights when they searched the apartment after he had expressly refused to give them consent to do so. The trial court reversed its earlier ruling denying defendant's motion to suppress, granted the motion, and suppressed the weapon recovered from the apartment.

¶ 11    The cause proceeded to trial. Before the trial proceedings began, the court informed defendant that although the gun was suppressed, defendant could not falsely testify that the police did not recover a gun from his apartment. If he made such a false statement, the prosecution would then be allowed to admit the gun into evidence.

¶ 12    During opening statements, the prosecution informed the jury that witness testimony would show that defendant threatened Mar and Soukouna with a gun and that cell phone video taken by Mar would corroborate the testimony. Defendant informed the jury that he was "in entertainment" and that the gun in question was a "fake gun," also known as a "dummy weapon" which was used for "video purposes." Defendant also told the jurors that he pointed the fake gun at Mar and Soukouna because they did not knock before entering and that the fake gun was never recovered by the police.

¶ 13    Following the opening statements, Soukouna testified that he is a contractor who rehabs houses and buildings and that he lives in one of the apartments located in the six-unit apartment

building at 6744 South Merrill. Mar is the owner of several apartments in the building and he employed Soukouna to help make any needed repairs.

¶ 14    At about 1 p.m. on December 1, 2018, Soukouna met Mar inside the building in front of apartment 2 South. Light was coming in through the windows and the hallway was well-lit. Mar knocked on the door. Defendant opened the door halfway and said, "Who the  f*** are you?" Soukouna, who was standing about four feet away from defendant, told him that Mar was the owner of the apartment.

¶ 15    Mar asked defendant what he was doing in the apartment. Defendant and Mar began yelling and cursing at each other. Defendant closed the door. Mar knocked on the door again. Defendant opened the door and had a gun in his hand. Soukouna testified that he had previously seen guns on more than 40 occasions and that he was "a hundred percent" sure that the object defendant was holding was a gun.

¶ 16    Defendant stepped forward, pointed the gun at Mar's face and threatened to "blow [his] head off." Soukouna told defendant to put the gun down. Defendant then pointed the gun at Soukouna's chest and continued yelling for about another 45 seconds. Soukouna was still "a hundred percent sure that [defendant] was pointing a real gun" at him. Defendant "eventually" went back inside the apartment. Soukouna and Mar went downstairs and called the police.

¶ 17    During defendant's cross-examination of him, Soukouna testified that a "dummy weapon" looks fake and that he can tell the difference between a real gun and a fake gun. The weapon defendant pointed at him was a real gun. Soukouna then testified in pertinent part:

"Q: How do you know if that weapon was recovered?

A: Police tell me they find loaded weapon, so *** all I know the police tell me they find a loaded weapon, that's all I know.

*** 

Q. So if the police tell you they found a loaded weapon you just agree with them and just think, ok, that's the weapon that he pointed at me? Did they show you the weapon?

A. They did not show me the weapon.

Q. Oh, so you didn't see a weapon?

A. I see the weapon when you point the weapon to me, yes."

¶ 18    After the conclusion of Soukouna's testimony, the State requested a sidebar and asked the court to reconsider its ruling granting defendant's motion to suppress the gun. The State argued that defendant's opening statement and his cross-examination of Soukouna falsely insinuated to the jury that the gun had not been recovered by police, thereby "opening the door" to allow the gun to be admitted into evidence.

¶ 19    In support, the State cited *Walder v. United States*, 347 U.S. 62 (1954). In *Walder*, the defendant there appealed his conviction for narcotics transactions in 1952. The defendant had also been indicted for similar offenses in 1950, but the 1950 case was dismissed when the court ruled that the evidence, a heroin capsule, was inadmissible due to an unlawful search and seizure. *Id.* at 62-63. At trial on the 1952 indictment, the defendant testified that he had never purchased, sold, or possessed illegal narcotics. *Id.* at 63. The State then questioned the defendant about the heroin capsule taken from his home in 1950; however, he denied that any narcotics were taken from him at that time. *Id.* at 64. The trial court then admitted testimony from one of the officers who had participated in the unlawful search and seizure in 1950 and also the chemist who had analyzed the heroin capsule there seized. *Id.* The court instructed the jury that the testimony from the officer and chemist "was not to be used to determine whether the defendant had committed the crimes here charged, but solely for the purpose of impeaching the defendant's credibility." *Id.* The

defendant was convicted. *Id.* The issue on appeal to the Supreme Court was "whether the defendant's assertion on direct examination that he had never possessed any narcotics opened the door, solely for the purpose of attacking the defendant's credibility, to evidence of the heroin unlawfully seized in connection with the earlier proceeding." *Id.*

¶ 20    The Supreme Court answered this question in the affirmative, stating:

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." *Id.* at 65.

¶ 21    The Supreme Court reasoned that "of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics" and noted that "there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." *Id.* Accordingly, the Supreme Court held that the trial court had not erred in admitting evidence of the defendant's possession of heroin in 1950 (which evidence had been suppressed in that case) in order to impeach his false contention in the subsequent case that he had never before dealt or possessed narcotics. *Id.* at 66.

¶ 22    Pursuant to *Walder*, the State here argued to the trial court that the suppressed gun should be admitted into evidence to rebut defendant's false insinuations during opening statement and in his cross-examination of Soukouna that the gun had never been recovered by police. The court stated it was deferring its ruling and the trial resumed with Mar's testimony.

¶ 23    Mar testified that he owns five of the six apartment units at 6744 South Merrill, including apartment 2 South, and that he rents them out. On December 1, 2018, Mar went to apartment 2

South to get the keys from the tenant, Lisewski, who "basically terminated the lease." Lisewski gave Mar the keys and stated that there might be a squatter living in the unit.

¶ 24    Mar contacted his building manager, Soukouna, and at about noon they met in front of apartment 2 South and knocked on the door. Defendant opened the door. Mar had never before seen defendant. Mar identified himself as the owner of the apartment and asked defendant what he was doing there. Defendant said he did not know Mar and shut the door.

¶ 25    Mar knocked on the door again and turned on his cell phone video to record what was about to happen. About two minutes later, defendant opened the door and said that the apartment belonged to him and that he had the right to stay there. Mar told defendant that he had no right to possess the apartment. Defendant responded that he had made rental payments to Mar's management company. The conversation then became more "heated." Defendant tried to close the door but Mar blocked him from doing so.  Defendant told Mar to take him to court and to "get the f*** out of here." Mar told Soukouna to call the police.

¶ 26    Defendant then reached behind his back, pulled out a small, black handgun, and  pointed it at Mar's face. Mar was about two feet away from defendant and had a clear view of the gun, as the building was well lit and nothing was obstructing his view. Mar knew that it was a real gun because he was staring down its barrel. Mar testified that prior to his encounter with defendant, he had seen real handguns "at least 15 to 20 times." Mar stated that there were guns in his household when he was young and that he had also gone to gun shops and viewed guns there.

¶ 27    When defendant pulled the gun on him, Mar dropped the phone down to his side, and backed away. Defendant threatened to "blow [Mar's] head off" and to blow up the building, and stated that Mar would have to pay him in order to get him to leave.

¶ 28    Soukouna told defendant "don't do this." Defendant pointed the gun at Soukouna's chest, told him to "get the f*** out" and closed the door. Mar called the police, explained what had happened, and showed them his cell phone video when they arrived.

¶ 29    Mar's cell phone video was published to the jury. The video, which is contained in the record on appeal, begins with defendant standing in the doorway of his apartment saying "I don't know you" to Mar. Mar can be heard saying that defendant is squatting and he tells Soukouna to call the police. Defendant denies that he is a squatter, states that he paid rent, and yells at Mar not to push on his door. Defendant and Mar yell back and forth at each other and defendant can be seen reaching behind his back and pulling out a black object that looks like a gun. At that point, the video turns away from defendant and shows the floor and the stairs in the hallway outside the apartment. Defendant can be heard threatening to "blow your s*** off", tells Mar to call the police, and slams the door.

¶ 30    After the video was published, the State renewed its motion for the court to reconsider its ruling on the motion to suppress and to allow the gun to be admitted into evidence. The court granted the prosecution's motion, finding that defendant had falsely informed the jury during his opening statement and in his cross-examination of Soukouna that the gun was never recovered from the apartment. The court stated that, "pursuant to *Walder v. United States*, the so-called door has been opened. I'm going to permit the State to elicit testimony regarding the recovery of that which was previously ordered to be suppressed."

¶ 31    The State called Officer Dodge, who testified that at about 1 p.m. on December 1, 2018, she received a call to assist other officers who were responding to a "disturbance with a gun" at 6744 South Merrill. When Officer Dodge arrived, she had a conversation with Mar and Soukouna

and viewed the cell phone video that was recorded on Mar's phone. She then searched apartment 2 South and recovered a black, 9-millimeter handgun from a bedroom closet.

¶ 32 Officer Dodge was wearing a body worn camera that day. People's exhibit 3 was the footage from Officer Dodge's body cam, which was admitted into evidence and is contained in the record on appeal. In the video footage, Officer Dodge can be seen recovering the gun from a shelf in the closet and unloading the gun, which had a magazine containing ammunition.

¶ 33 Officer Dodge identified People's exhibit 4A as the gun recovered from the apartment. People's exhibit 4B was the magazine she removed from the gun. People's exhibit 4C was the ammunition, the live rounds that had been located in the magazine. People's exhibits 4A, 4B, and 4C were admitted into substantive evidence; the jury was not instructed to consider the evidence for impeachment purposes only.

¶ 34 Officer Dodge testified that People's exhibit 4A was the only firearm that she recovered from the apartment. She did not recover a fake gun or a dummy gun.

¶ 35 Following Officer Dodge's testimony, the State introduced a certified copy of defendant's conviction in case no. 99 CR 09693-01 for aggravated vehicular hijacking. The court admitted it into evidence. The State then rested. Defendant renewed his request for standby counsel. The trial court again denied defendant's request.

¶ 36 Sergeant Sikorski testified for the defense but his testimony was damaging to defendant, as he stated that in the cell phone video, defendant can be seen holding a weapon that looks like a 9-millimeter handgun.

¶ 37 At the conclusion of all the evidence, the jury convicted defendant of UUWF and the trial court sentenced him to nine years' imprisonment. Defendant appeals.

¶ 38 First, defendant argues that the trial court erred when it reversed its earlier ruling granting his motion to suppress the gun and allowed its admission into substantive evidence. Our review of the admission of the weapon into evidence is for an abuse of discretion. *People v. Reid*, 179 Ill. 2d 297, 313 (1997).

¶ 39 Defendant argues that the trial court misread *Walder* when finding that he had opened the door to the admission of the gun into substantive evidence. In *Walder*, the Supreme Court addressed the application and scope of the doctrine of *Weeks v. United States*, 232 U.S. 383 (1914), which precludes the prosecution from utilizing evidence procured in violation of the fourth amendment to secure a conviction. The *Walder* court held that while evidence obtained in violation of the fourth amendment may be properly suppressed under *Weeks* and its progeny, defendant may not then use the suppression of the evidence to his advantage by taking the stand and falsely testifying that the evidence had never been recovered. *Walder*, 347 U.S. at 65. When a defendant resorts to such perjurious testimony in the belief that the earlier suppression of the evidence will prevent the prosecution from challenging his credibility, he opens the door to the admission of the evidence for impeachment purposes. *Id.* at 64-65.

¶ 40 Defendant correctly argues here that as the exception to the exclusionary rule set forth in *Walder* only allows for the admission of previously suppressed evidence for impeachment purposes, the court abused its discretion in the instant case by admitting the gun as *substantive* evidence. Further, even if the gun had been admitted for impeachment purposes only, and not as substantive evidence, we would find an abuse of discretion because the impeachment exception

set forth in *Walder* did not apply in the absence of defendant taking the stand and perjuriously testifying that the gun was never recovered. [2]

¶ 41    We also note that the trial court abused its discretion in finding that defendant's cross-examination of Soukouna opened the door to the admission of the gun into evidence under *Walder*. The impeachment exception set forth in *Walder* only allows prosecutors to introduce illegally obtained evidence for the limited purpose of impeaching the credibility of defendant's *own* perjurious testimony; the Supreme Court has expressly declined to extend the impeachment exception to allow prosecutors to introduce illegally obtained evidence to impeach defense witnesses other than defendant himself because doing so "would not further the truth-seeking value with equal force but would appreciably undermine the deterrent effect of the exclusionary rule." *James v. Illinois*, 493 U.S. 307, 320 (1990). Moreover, even *if* the *Walder* exception allowed for the admission of the gun to impeach the perjurious testimony of a witness other than defendant, the exception would not apply here because Soukouna did not perjure himself as he testified truthfully about the officers' recovery of the gun from the apartment.

¶ 42    Having determined that the court abused its discretion by admitting the gun as substantive evidence, we must next consider whether the error was harmless. Defendant argues that the admission of the gun was a constitutional error as it should have remained suppressed under the fourth amendment and that such a constitutional error may only be considered harmless if it appears beyond a reasonable doubt that the error did not contribute to the verdict. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005).  In considering whether the error contributed to the verdict,

---

[2] Also, as defendant's remarks in his opening statement regarding the recovery of the gun were not made under oath and therefore did not constitute perjury (see the definition of perjury in *People v. Kang*, 269 Ill. App. 3d 546, 550-51 (1995)), they were not sufficient under *Walder* to allow for the admission of the gun for impeachment purposes.

we may consider whether the other evidence overwhelmingly supported the conviction. *Id.* See also *People v. R.F.*, 355 Ill. App. 3d 992, 1001 (2005) ("Constitutional error may be harmless beyond a reasonable doubt where overwhelming other evidence supports the conviction.").

¶ 43 In the instant case, there was overwhelming evidence, apart from the gun, that supported defendant's conviction for UUWF. Initially, we note that the State proved that defendant was a felon by introducing the certified copy of conviction showing that he had a prior conviction for aggravated vehicular hijacking. With respect to his possession of the weapon, the State presented the testimony of Mar and Soukouna, who were consistent in their descriptions of how defendant pulled out a handgun during their verbal confrontation with him in the well-lit doorway of the apartment at 2 South. Defendant was standing only a few feet away from them and he aimed the gun first at Mar's face and then at Soukouna's chest while threatening to shoot. Mar and Soukouna testified to their certainty that the gun was real, as they each had seen guns on many prior occasions and Soukouna specifically testified to his ability to ascertain the difference between a "dummy weapon," which looks fake, and a real gun. Their testimony was corroborated by the cell phone video taken by Mar, which depicted the verbal argument between defendant, Mar, and Soukouna and also showed defendant reaching behind his back and pulling out an object that looks like a small, handgun. Further corroboration was provided by Sergeant Sikorski, who testified that in the cell phone video, defendant can be seen holding a weapon that looks like a 9-millimeter handgun.

¶ 44 Defendant commented during his opening statement and closing argument that he was holding a fake, "dummy" gun, not a real gun, but there was absolutely no evidence presented at trial that the weapon which was identified by Mar, Soukouna, and Sikorski as a real handgun, and which can be seen in the cell phone video, was fake. No witness testified at trial that the weapon

was fake or a "dummy weapon;" the only evidence presented at trial regarding the gun was that it was a real handgun.

¶ 45    We conclude that the admission of the gun into substantive evidence was harmless given the overwhelming other evidence supporting defendant's conviction for UUWF.

¶ 46    Next, defendant argues that the trial court erred by denying his repeated requests for standby counsel. "Relevant criteria appropriately considered by a trial court in deciding whether to appoint standby counsel to assist a *pro se* defendant in a criminal case include the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant." *People v. Gibson*, 136 Ill. 2d 362, 380 (1990). The trial court's decision denying defendant's motion for standby counsel is reviewed for an abuse of discretion. *Id.*

¶ 47    We find *People v. Ware*, 407 Ill. App. 3d 315 (2011), to be informative. In *Ware*, the defendant there was charged with attempted first degree murder and aggravated battery. *Id.* at 351. The trial court denied him the assistance of standby counsel. *Id.* at 350. We found no abuse of discretion. *Id.* at 352-53. Although the charges were "serious," resulting in a sentence of 25 years' imprisonment, the facts and law involved with the charges were not complex; defendant was accused of stabbing the victim in the head with a knife, and he claimed self-defense. Id. at 351. The evidence consisted primarily of testimony from the victim, his wife, police officers, and defendant; there were no expert witnesses or any scientific evidence. *Id.* at 351-52. Finally, defendant was over 40 years old and "no stranger to criminal proceedings." *Id.* at 352. We also noted that given the "overwhelming" evidence in the case, "[t]he presence of standby counsel likely would not have made any difference in defendant's ability to defend his case." *Id.*

¶ 48    In the present case, the charges were less grave than in *Ware*, as defendant was charged with UUWF, resulting in a sentence of nine years' imprisonment. With respect to the factual and legal complexity of the proceedings, defendant did not dispute his status as a felon, making this a simple possession case involving no expert witnesses or any scientific evidence. With respect to the abilities and experience of the defendant, he was a 36-year-old man who had completed two years of college and was no stranger to criminal proceedings, as he stated that he had previously successfully represented himself on a case in Iowa and on another unidentified case. Finally, the overwhelming evidence in this case (even apart from the gun which was improperly admitted into evidence), also indicates that the presence of standby counsel likely would not have made a difference in defendant's ability to defend his case. Accordingly, we find no abuse of discretion in the trial court's decision to deny defendant's repeated requests for standby counsel.

¶ 49    Defendant contends, though, that standby counsel should have been appointed because he did not know to argue, during the hearing on the suppression motion, that the gun should be barred from evidence pursuant to *Georgia v. Randolph* because he refused to consent to the search of the apartment. Defendant's contention is not well taken, because the arguments he did make during the hearing on the suppression motion ultimately caused the court to find, pursuant to *Georgia v. Randolph*, that the search violated the fourth amendment and that the gun should be suppressed. The presence of standby counsel would have provided no additional benefit to defendant.

¶ 50    Defendant also argues that standby counsel should have been appointed because after the gun was suppressed, he "managed to self-sabotage his case because he did not know the extent to which he could elicit testimony about the gun and delved too far when cross-examining Moussa Soukouna," thereby causing the court to reverse its earlier suppression ruling and admit the gun into substantive evidence. As we have discussed earlier in this order, though, defendant's cross-

examination of Soukouna did not open the door to the admission of the gun into substantive evidence where he did not elicit any perjurious testimony regarding the recovery of the gun; the substantive admission of the gun was the result of the trial court's improper application of *Walder* and not the result of any error by defendant that could have been alleviated by standby counsel. Moreover, the overwhelming other evidence of defendant's guilt made the admission of the gun harmless as he likely would have been convicted anyway, further indicating that the presence of standby counsel would have made no difference in defendant's case.

¶ 51 For all the foregoing reasons, we affirm the judgment of the circuit court.

¶ 52 Affirmed.