2025 IL App (1st) 220365-U

No. 1-22-0365

Order filed June 30, 2025

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 21018 |
| | ) | |
| ERIC SMITH, | ) | Honorable |
| | ) | Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's convictions for first degree murder and attempted first degree murder, as well as his 63-year sentence, over his contentions that (1) the trial court should not have allowed him to represent himself at trial, (2) the evidence established that he was guilty but mentally ill, and (3) his sentence is improper.

¶ 2    Following a bench trial, the trial court found defendant Eric Smith guilty of first degree murder and attempted first degree murder. The court sentenced defendant to 63 years in prison. On appeal, defendant argues that (1) his waiver of his right to counsel was invalid and the trial

court should not have allowed him to represent himself at trial, (2) the court should have found him guilty but mentally ill, and (3) his sentence is improper. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State charged defendant with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2008)), arising out of the fatal stabbing of Fias Mannie and one count of attempted first degree murder (*id.* §§ 8-4(a), 9-1(a)(1), (2)), arising out of the nonfatal stabbing of Fias's then-infant daughter B.M., who is still a minor.

¶ 5      In 2014, the case proceeded to a jury trial at which private counsel represented defendant. The evidence established that, during a family gathering on October 25, 2009, in South Holland, Illinois, defendant stabbed Fias to death and severely wounded B.M. *People v. Smith*, 2017 IL App (1st) 143728, ¶¶ 18-22. The jury found defendant guilty on all counts and the trial court sentenced him to 58 years in prison. *Id.* ¶ 40. On direct appeal, defendant argued, in relevant part, that the State presented inflammatory arguments and improper evidence to the jury. *Id.* ¶ 1. We agreed, reversed, and remanded for a new trial. *Id.*

¶ 6                          A. Pretrial Proceedings on Remand

¶ 7      On remand, the trial court appointed an assistant public defender (APD) to represent defendant. On February 5, 2019, defendant told the trial court that he wanted to proceed "*pro per*" as a "sovereign citizen." The court responded that there was no such legal concept and defendant stated that he wanted to proceed *pro se*. The court explained that defendant representing himself "would be the biggest mistake of [his] life" and that the court would hold him to the same standard as an attorney if he did so. At the next court date, defendant withdrew his request to proceed *pro se*.

¶ 8    On February 21, 2020, defendant again sought to represent himself and the trial court again told him that doing so "would be the absolute biggest mistake of [his] life." The court explained that, to present an insanity defense, defendant would have to call an expert witness and cross-examine the State's expert witness, and that a jury would not accept a *pro se* defendant presenting an insanity defense anyway. The court also warned defendant that the assistant state's attorneys (ASAs) "probably ha[d] close to 200 jury trials" worth of experience and analogized defendant trying the case against them to a high school football team playing an NFL team. Defendant dismissed the ASAs' experience as "nothing." The court ordered a fitness evaluation.

¶ 9    Forensic psychiatrist Dr. Willie Mae Jackson examined defendant on March 10, 2020, and issued a report finding him fit to stand trial with medication on July 22, 2020. Dr. Jackson's report stated that defendant had "a history of psychiatric illness *i.e.* anxiety, depression, and psychosis," but he was "in remission with medications," "cognizant of the charges, underst[ood] the nature of the purpose of the court proceedings, and demonstrate[d] an ability to assist counsel in a rational manner."

¶ 10    On September 1, 2020, the court ordered a second fitness evaluation, which Dr. Fidel Echevarria conducted on November 2, 2020. The trial court held a fitness hearing on December 14, 2020, at which Dr. Echevarria testified and was qualified as an expert in forensic psychiatry. Dr. Echevarria concluded that defendant understood the charges against him, the difference between a felony and a misdemeanor, how evidence is presented, the roles that prosecutors and defense attorneys play, and the possible sentences in this case. Defendant also understood what a verdict of not guilty by reason of insanity was and "what it entail[ed] for him in terms of sentence or a placement following such a finding." Defendant expressed to Dr. Echevarria his frustration

that the case was proceeding slowly but confirmed that he could assist in his own defense. Defendant was taking antidepressants and antipsychotic medication. Dr. Echevarria diagnosed defendant with "schizophrenia spectrum, other psychotic disorder." Dr. Echevarria concluded that defendant was fit to stand trial. Based on Dr. Echevarria's testimony, the trial court found defendant fit to stand trial with medication.

¶ 11    On March 9, 2021, defendant filed a *pro se* motion to represent himself, which argued that "[p]sychiatrist[s] ha[d] already deemed [him] capable and fit with medication." At a videoconference hearing on April 2, 2021, defendant confirmed that he wanted to represent himself. The following exchange occurred:

> "THE COURT: Mr. Smith, you're charged, as [the State] just told us, with the offense of murder and the offense of attempted murder. The sentence range for murder is anywhere from 20 to 60 years in the Illinois Department of Corrections followed by three years mandatory supervised release. If you are convicted of the murder, you must serve at [one] hundred percent. Do you understand that?
>
> THE DEFENDANT: No, I don't understand that.
>
> (Laughter.)
>
> THE COURT: What don't you understand?
>
> THE DEFENDANT: I don't understand sentencing guidelines. I don't understand no laws. I don't understand nothing that has to do with this, Judge.
>
> (Laughter.)
>
> ***

THE COURT: — you — if you don't understand that simple thing about what your sentencing range is, what makes you think you can represent yourself at a trial?

THE DEFENDANT: Judge, at this point I don't believe that has anything to do with me representing myself in a trial.

THE COURT: No, it does. It does have something to do with it.

\*\*\*

THE COURT: The law says, Eric, that I have to admonish you about these things so that you can make a—an understanding waiver of your right to be represented by an attorney. And if I don't do that, then the Appellate Court gets mad at me.

THE DEFENDANT: But at this point, Judge, I feel like I want to waive that understanding due to the fact that I feel like that at this point—specifically the guidelines are irrelevant to the case that—due to the pretrial—the pretrial—the prosecution phase. So we want to go straight to the—to the—to the case, Judge, and see what's going to happen there."

The court continued defendant's motion for an in-person hearing.

¶ 12    At an in-person hearing on April 28, 2021, defendant stated that he was 30 years old and graduated from high school but did not attend college and had no legal training. The court read the charges against defendant and the factual basis for them. The court explained that defendant could be sentenced to 20 to 60 years in prison on the first degree murder charge, that he would have to serve 100% of that sentence, and that he would be subject to 3 years of mandatory supervised release (MSR). The court also explained that defendant could be sentenced to 6 to 60 years on the attempted murder charge, that he would serve 85% of that sentence, and that he would be subject

to 3 years of MSR. The court stated that the sentences on the murder and attempt murder charges would run consecutively. The court explained that defendant had the right to an attorney, that an attorney would be provided for him if he could not afford one, and the role that an attorney would play in his case. The court told defendant that, if he represented himself, the court would not help him and would hold him to the standard of an attorney. Finally, the court warned defendant that he "would be outmatched at trial" and that attempting to represent himself was the "wors[t] mistake" he could make. Defendant stated that he understood each of these admonitions, had no questions about them, and wanted to represent himself. The court found that defendant's waiver of counsel was knowing, voluntary, and intelligent, and allowed defendant to proceed *pro se*.

¶ 13    The record does not reflect any discussion of appointing standby counsel for defendant. However, during the April 28, 2021, hearing, the court asked defendant how he would respond to a foundation objection by the State to illustrate the difficulties he would encounter at trial. Defendant said that he would ask the court "what is the foundation," and the court responded, "I'm not telling you." The following exchange occurred:

> "THE DEFENDANT: You can tell me. You have to tell me. I got to go *pro per* so you can help me so I have to have a person here to help me with—
>
> THE COURT: No, you're on your own. I would not answer a question for a lawyer, and I'm not going to answer a question for you.
>
> THE DEFENDANT: Okay. I can look it up."

Following this discussion, defendant again confirmed that he wanted to represent himself even though he was not proficient in the Rules of Evidence. The trial court did not appoint standby counsel.

¶ 14     At a hearing on May 27, 2021, the trial court suggested that defendant should allow an attorney to help him understand DNA, fingerprint, and medical evidence that the State had produced in discovery. Defendant insisted that he could understand such evidence himself.

¶ 15     Defendant filed a motion seeking payment of expert fees to psychologist Dr. Georgia Conic, which the trial court heard on August 12, 2021. At defendant's 2014 jury trial, Dr. Conic had testified that she diagnosed defendant with schizophrenia in August 2009 and that he was in a "psychogenic fugue state" on October 25, 2009. *Smith,* 2017 IL App (1st) 143728, ¶¶ 27-29. The trial court instructed defendant to file documentation of Conic's expenses in connection with testifying at his second trial. The court also noted that defendant sent the ASA a letter that was so obscene the court could hold defendant in contempt for doing so and warned him not to send similar letters in the future. On September 2, 2021, defendant withdrew his motion seeking Dr. Conic's fees in favor of setting a trial date more quickly, even though the court indicated it was willing to pay Dr. Conic's fees. Defendant stated that he did not need an expert witness.

¶ 16     On October 5, 2021, defendant presented a motion seeking payment of $5000 in fees to purported psychiatrist Antoinette Smithers so she could travel from Michigan to evaluate defendant and testify at trial. The court expressed skepticism that a letter allegedly written by Smithers was genuine and instructed defendant to provide Smithers's CV and a letter on her professional letterhead documenting her fees. Defendant asked the trial court to "[f]orget about" Smithers so as not to delay the trial date. The State later confirmed that Smithers was defendant's relative and was not a doctor.

¶ 17                                         B. Trial

¶ 18    Trial began on November 15, 2021. Defendant did not meaningfully dispute the facts of this incident. Instead, he sought a verdict of not guilty by reason of insanity.

¶ 19    The evidence established that defendant traveled from his home in Michigan to the Chicago suburbs to visit family in October 2009. On the evening of October 25, 2009, defendant was at the home of Fias Mannie and his wife Shavon Mannie for a family gathering. Fias and Shavon's daughter B.M. was six months old at the time. After dinner, Fias and defendant watched football in the living room. Fias was holding B.M. Defendant suddenly stabbed Fias, which Shavon and her brother Floyd Wimberly witnessed. Floyd grabbed defendant, slammed him against a wall, and saw a knife in his hand. Floyd recognized the knife from a neighbor's house that he and defendant helped clean six days earlier. Floyd later learned that defendant was also armed with a second knife from Floyd's junk drawer. Floyd identified both knives in court. Floyd dragged defendant out of the house and defendant fled. Meanwhile, Shavon found B.M. on the living room floor and saw that her "whole top lip was gone." Fias stumbled outside, holding his neck and gushing blood from his nose. Fias fell to the ground across the street from his house and a neighbor tried to provide first aid. Paramedics arrived and transported Fias and B.M. to the hospital. Fias died at the hospital and B.M. underwent emergency surgery.

¶ 20    Veottrice Whitlock lived five houses away from the Mannies and found defendant in his driveway. Defendant asked Whitlock for a ride to Sauk Village, but Whitlock refused. Defendant then asked to use Whitlock's wife's phone; she also refused. Whitlock later identified defendant in a lineup at the police station.

¶ 21    South Holland police found defendant walking down the street, confirmed his identity, arrested him, and transported him to the police station. Police recovered a black shirt from the

backyard fence of a house on the same block as the Mannies' home. One house north of that, police recovered a black jacket from an empty garbage can, as well as a knife from the backyard. Police also recovered a second knife from the pool cover of a house next to the Mannies' home. A South Holland detective interviewed defendant at the police station on October 26, 2009. Defendant indicated that he understood his *Miranda* rights and agreed to speak with the detective. Defendant's behavior during the interview was normal and his responses were appropriate. The detective saw blood on defendant's shirt and a laceration between his right thumb and index finger.

¶ 22    Fias's autopsy documented stab wounds to his lip, left cheek, chest, right shoulder, and right hand. The chest wounds struck Fias's carotid artery and jugular vein, causing fatal blood loss.

¶ 23    Illinois State Police scientist Christopher Webb was qualified as an expert in forensic biology. On defendant's shirt, Webb identified a mixture of two DNA profiles, one of which matched Fias's DNA.

¶ 24    The State moved into evidence photographs of Fias while he was alive, his body during the autopsy, the scene, the clothing and knives police recovered from nearby houses, B.M.'s injuries, defendant and his injured hand, and the lineup in which defendant was identified. The State also moved in the autopsy report and the physical evidence recovered in this case, along with a map showing where police recovered the evidence.

¶ 25    Defendant called his mother, Patricia Smith. Patricia testified that defendant attended an alternative high school due to behavioral problems. Defendant "had a nervous breakdown" before he traveled to the Chicago area in 2009; he was talking to himself and said that he was hearing voices. Patricia testified that a psychologist diagnosed defendant as being "schizophrenic claustrophobic" but did not prescribe him medication.

¶ 26    Defendant testified on his own behalf. He apologized for "what happened to Mr. Fia[s]" and claimed that the stabbing was "an accident" that he "never planned" and "never meant *** to happen." On cross-examination, defendant testified that, every day in 2009, he heard voices telling him to kill, including while he was at the Mannies' home on October 25. Defendant testified that he did not remember anything that occurred on October 25, 2009, and denied that he "knew right from wrong." However, he remembered watching football in the Mannies' home that evening and acknowledged that he was "in a mode to kill" and was armed with two knives. Defendant did not remember meeting or being diagnosed by Dr. Conic in 2009. He never followed up with Dr. Conic or any other doctor and never sought medication for mental health issues prior to this incident. When defendant was admitted to Cook County jail in October 2009, he did not report that he suffered from mental illness. Defendant first received treatment for mental illness in 2010, approximately eight months after stabbing Fias and B.M.

¶ 27    Defendant moved into evidence medical records from Cook County Health and Hospitals System. The State objected to these records as hearsay, but the trial court admitted them pursuant to the business records exception. The records reflect several instances of mental health treatment following defendant's detention in Cook County jail in October 2009. On February 9, 2011, defendant exhibited severe hallucinations and acted aggressively toward staff. The following day, defendant was paranoid and had grandiose delusions. On March 20, 2011, defendant complained of psychotic symptoms but reported to staff that he was not hearing voices and was taking his medication. On May 2, 2012, defendant was paranoid and agitated.

¶ 28    In rebuttal, the State called Dr. Echevarria and the trial court qualified him as an expert in psychiatry. On June 25, 2021, Dr. Echevarria evaluated defendant to determine his sanity at the

time of the offenses. Dr. Echevarria opined that defendant's interview with police following his arrest suggested that he was not "paranoid or having any psychic symptoms." When defendant was admitted to Cook County jail on October 28, 2009, he was not referred for mental health treatment or assigned to "the psych[iatric] unit;" rather, he was placed in general population. In June 2010, approximately eight months after the incident that gave rise to this case, defendant was treated for depression and auditory hallucinations. Dr. Echevarria diagnosed defendant with schizophrenia spectrum and audio psychotic disorder. Dr. Echevarria ruled out schizoaffective disorder, bipolar type, bipolar disorder, unspecified mood disorder, antisocial personality disorder, and seasonal affective disorder, bipolar type. Dr. Echevarria explained that "[s]chizophrenia in and of itself doesn't mean that the person was having symptoms at that particular time." Dr. Echevarria concluded that defendant was legally sane at the time of the offense in this case.

¶ 29   In closing, the State argued that there was no dispute defendant stabbed Fias and B.M. and there was no evidence he was insane or mentally ill when he did so. Defendant argued that Dr. Echevarria's opinion was incorrect and biased in favor of the State. He contended that he suffered from "significant" mental illness on October 25, 2009, which "impaired [his] judgment at the time of the crime" and requested a verdict of not guilty by reason of insanity. In rebuttal, the State argued that defendant's behavior on October 25, 2009, showed that he was aware he had committed a crime. The State also noted that defendant received no substantial mental health treatment until 2010, almost a year after stabbing Fias and B.M.

¶ 30   The trial court found defendant guilty on all counts. The court explained that the evidence of defendant's guilt was overwhelming and unchallenged. The court rejected defendant's insanity defense, reasoning that, aside from his testimony that he heard voices telling him to kill, defendant

"presented no other credible evidence or any expert or testimony regarding any treatment he has received for mental health issues in the past." In support of this conclusion, the court cited Dr. Echevarria's opinion that defendant was sane at the time of the offenses and the fact that defendant did not start receiving mental health treatment until approximately eight months after this incident. The court also explained that defendant's flight from the scene and his attempts to hide the knives and his clothes supported an inference that defendant knew he had committed crimes and tried to escape responsibility for them.

¶ 31    Defendant filed a *pro se* motion for a new trial. Relevant here, defendant argued that the evidence of his mental illness was "insurmountable" and there was reasonable doubt as to his ability to understand the criminality of his behavior. The trial court denied defendant's motion, explaining that it accepted Dr. Echevarria's opinion that defendant was legally sane and not mentally ill at the time of the offenses.

¶ 32                                    C. Sentencing

¶ 33    Defendant was *pro se* at the sentencing hearing on March 10, 2022. The trial court stated that it received defendant's presentence investigation report (PSI). The PSI indicated that defendant was convicted of larceny and driving on a suspended or revoked license in Michigan in 2008. The State added that defendant was convicted of aggravated battery in a 2020 case and had a pending public indecency case, both of which arose from incidents in Cook County jail. The PSI documented defendant's claim that in 2009, prior to the incident that gave rise to this case, his mother took him to see a mental health professional on one occasion. Defendant was diagnosed with schizophrenia, psychosis, depression, and anxiety while detained in Cook County jail.

¶ 34    In aggravation, Cook County jail assistant executive director Steve Wilensky identified reports reflecting defendant's 26 disciplinary issues since 2018. Wilensky testified that defendant was disciplined for fighting another detainee on November 24, 2019, exposing himself to a correctional officer on May 7, 2020, grabbing a correctional officer's breast on June 5, 2020, fighting another detainee on June 9, 2020, exposing himself to and verbally harassing a correctional officer on August 5, 2020, masturbating in front of a correctional officer on February 5, 2021, exposing himself to and fighting another detainee on May 16, 2021, and exposing himself in the dayroom on January 7, 2022.

¶ 35    Roxanne Brown-Mannie testified that Fias Mannie was her son. She read a victim impact statement describing the "unmeasurable" "emptiness in [her] heart" from her son's murder, as well as B.M.'s difficulty coping with the death of her father and the facial scars defendant's attack caused. Roxanne also noted defendant's "arrogance, disrespect, and inappropriate behavior" in the courtroom, such as waving, staring, smiling, and blowing kisses at the Mannie family.

¶ 36    Defendant presented no evidence in mitigation. When addressing the victims' family, defendant claimed that God caused him to attack Fias and B.M. and said that he did not regret anything.

¶ 37    The State argued that the court should increase defendant's original 58-year sentence based on his misconduct in jail. Defendant requested "100 years," "life," or "the maximum time that the law allows."

¶ 38    The court merged the first degree murder counts and sentenced defendant to 45 years for murder plus 18 years for attempted murder, to be served consecutively for a total of 63 years in prison. The court rejected defendant's claim that God caused him to stab Fias and B.M. The court

agreed with the State that defendant's history of misconduct in jail showed that he refused "to follow the rules and regulations that society has set forth" and highlighted that defendant had been convicted of aggravated battery while awaiting retrial in this case. The court described defendant as "an evil person" and noted that he was "blowing kisses" to people in court and had written "absolutely filthy" letters to the ASA. Defendant did not file a motion to reconsider sentence. Rather, he filed a notice of appeal the day he was sentenced.

¶ 39    Thereafter, defendant filed a series of *pro se* motions in the trial court. On March 17, 2022, defendant filed a "motion for stay" to prevent some sort of transfer, presumably to the Illinois Department of Corrections. On March 22, 2022, defendant filed a "motion for leave" that raised the same arguments as his motion for a new trial. The record suggests that motion may have been an attempt to appeal directly to the Illinois Supreme Court. On June 9 or July 15, 2022, defendant filed a "petition for a certificate of innocence." On August 22, 2022, defendant filed a "motion for immediate release" arguing that "[t]he evidence of insanity at the time of the crime was clear and convincing, and without any doubt." The trial court did not rule on any of these filings.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, defendant contends that his waiver of his right to counsel was invalid and the trial evidence established that he was guilty but mentally ill. He also challenges his 63-year sentence.

¶ 42                                    A. Jurisdiction

¶ 43    First, we must examine our jurisdiction. See *People v. Lewis*, 234 Ill. 2d 32, 36-37 (2009). We must consider what, if any, effect the *pro se* motions defendant filed after his notice of appeal have. Supreme Court Rule 606(b) (eff. April 15, 2024), provides that

"[w]hen a *timely* posttrial or postsentencing motion directed against the judgment has been filed *** by defendant, if not represented by counsel, any notice of appeal filed before the entry of the order disposing of all pending postjudgment motions shall have no effect and shall be stricken by the trial court.

***This rule applies whether the timely postjudgment motion was filed before or after the date on which the notice of appeal was filed." (Emphasis added.) *Id.*

In other words, "when a timely posttrial or postsentencing motion directed against the judgment is filed, even after a notice of appeal is filed, the notice must be stricken." *People v. Darr*, 2018 IL App (3d) 150562, ¶ 90.

¶ 44 The trial court was not required to strike defendant's notice of appeal because none of his *pro se* filings after March 10, 2022, were timely. To the extent those filings challenged the trial court's findings of guilt and sought a new trial, they were untimely. The trial court found defendant guilty on December 9, 2021, so any motion for a new trial was due 30 days thereafter, on January 10, 2022. See 725 ILCS 5/116-1(b) (West 2020). In addition, "[t]he plain language of Rule 606(b) contemplates the filing of only one postjudgment motion directed against the final judgment." (Internal quotation marks omitted.) *People v. Stevenson*, 2011 IL App (1st) 093413, ¶ 35. Rule 606(b) does not allow "successive and repetitious motions that raise issues that were or could have been raised earlier and thereby extend the time for appeal." *Id.* Defendant filed a motion for a new trial prior to sentencing, which the trial court denied, and he was not entitled to file multiple successive motions seeking the same relief. See *id.*

¶ 45 Moreover, none of defendant's filings after March 10, 2022, challenged his sentence, so none of them constituted a timely motion to reconsider sentence. Rule 606(b) applies only to

"timely posttrial or postsentencing motion[s]" (Ill. S. Ct. R. 606(b) (eff. Dec. 7, 2023)), and none of defendant's filings after March 10, 2022, fall into those categories. Therefore, the trial court was not required to strike defendant's notice of appeal. Defendant's notice of appeal was timely because he filed it on the same day he was sentenced (see *id.*), so we have jurisdiction over this appeal.

¶ 46                    B. Waiver of Trial Counsel

¶ 47    Defendant contends that the trial court erred by accepting his waiver of counsel and allowing him to represent himself at trial.

¶ 48    Defendant did not raise this issue in his posttrial motion. Generally, to preserve an issue for appellate review, a defendant must object at trial and raise the issue in a posttrial motion. *People v. Brand*, 2021 IL 125945, ¶ 32. If the defendant fails to do so, he forfeits the issue on appeal. *Id.* However, defendant seeks plain error review of this issue. We may review an unpreserved issue for plain error when a clear or obvious error occurred and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant regardless of the seriousness of the error or (2) the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 48. The validity of a defendant's waiver of counsel affects a fundamental right, so we will review for plain error. See *People v. Khan*, 2021 IL App (1st) 190051, ¶ 40. The defendant has the burden of persuasion in a plain error analysis. *Id.* ¶ 41. The first step of plain error review is to determine whether a clear or obvious error occurred. *Id.*

¶ 49                        1. Validity of Waiver

¶ 50    The sixth amendment to the United States Constitution guarantees a criminal defendant the right to proceed *pro se*. U.S. Const., amend. VI; *People v. McNutt*, 2020 IL App (1st) 173030, ¶ 78 (citing *People v. Haynes*, 174 Ill. 2d 204, 235 (1996)). The Illinois Constitution guarantees the right to self-representation as well. Ill. Const. 1970, art. I, § 8; *People v. Simpson*, 204 Ill. 2d 536, 573 (2001). The right to self-representation is "as basic and fundamental as [the] right to be represented by counsel." (Internal quotation marks omitted.) *People v. Marcum*, 2024 IL 128687, ¶ 43. A trial court must honor a defendant's decision to represent himself even though it might be unwise. *McNutt*, 2020 IL App (1st) 173030, ¶ 78.

¶ 51    We will reverse a trial court's acceptance of a defendant's waiver of counsel only if the trial court abused its discretion. *Id.* ¶ 85. An abuse of discretion occurs when the trial court's ruling was arbitrary, fanciful, or so unreasonable that no reasonable person would agree with it. *Id.* Abuse of discretion review is the most deferential standard of review in Illinois law (*People v. Radojcic*, 2013 IL 114197, ¶ 33), and just because we might have reached a different conclusion does not mean that the trial court abused its discretion (*In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 708 (2006)).

¶ 52    To validly waive the right to counsel, a defendant must be fit to stand trial. *People v. Harris*, 2013 IL App (1st) 111351, ¶ 79. To be fit to stand trial, a defendant must have a rational and factual understanding of the proceedings against him. *People v. Washington*, 2016 IL App (1st) 131198, ¶ 70. Illinois law presumes that a defendant is fit to stand trial. 725 ILCS 5/104-10 (West 2008). A defendant is unfit if, because of a mental or physical condition, he is unable to understand the nature and purpose of the proceedings or unable to assist in his defense. *Id.*

¶ 53    In this case, there is no dispute that defendant was fit to stand trial. Drs. Jackson and Echevarria both reached that conclusion, and Dr. Echevarria testified to the basis for that opinion at the fitness hearing. Defendant does not challenge his fitness to stand trial.

¶ 54    Because defendant was fit to stand trial, the issue is whether his waiver of counsel was knowing and voluntary. See *Harris*, 2013 IL App (1st) 111351, ¶ 79; *Godinez v. Moran*, 509 U.S. 389, 400-402 (1993) (if a defendant is fit to stand trial and knowingly and voluntarily waives his right to counsel, then he receives a fair trial that comports with due process); *People v. Kidd*, 178 Ill. 2d 92, 104 (1997). All waivers of counsel must be "voluntary, knowing, and intelligent." *Marcum*, 2024 IL 128687, ¶ 43. To ensure that a defendant's waiver of counsel is voluntary, knowing, and intelligent, the trial court must comply with Supreme Court Rule 401(a) (eff. July 1, 1984). *Marcum*, 2024 IL 128687, ¶ 44. Rule 401(a) provides:

"Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has the right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

Strict compliance with Rule 401(a) is not always required. *Marcum*, 2024 IL 128687, ¶ 46. Substantial compliance with Rule 401(a) is sufficient if the record establishes that the defendant's waiver of counsel was knowing and voluntary and the admonishments he received did not prejudice his rights. *Id.* We assess each waiver of trial counsel on its own facts. *Id.*

¶ 55    In this case, the trial court fully complied with Rule 401(a). The court advised defendant of (1) the charges against him and the factual basis for those charges, (2) the sentencing range as to each charge, and (3) his right to counsel including appointed counsel if he was indigent. See Ill. S. Ct. R. 401(a)(1)-(3) (eff. July 1, 1984). Defendant confirmed that he understood each of these admonitions. In addition, the court gave more admonishments than Rule 401(a) required. The court repeatedly warned defendant that it would not assist him, that it would hold him to the same standard as an attorney, and that he would be outmatched facing experienced ASAs at trial. There is no question that the trial court complied with Rule 401(a), so defendant's waiver of counsel was valid. See *Marcum*, 2024 IL 128687, ¶ 44.

¶ 56    Nevertheless, defendant argues that "severe mental illness precluded him from knowingly waiving the right to counsel and representing himself at a murder trial." It does appear that defendant suffers from mental illness. However, the fact that defendant is mentally ill does not automatically mean that he was incapable of validly waiving his right to counsel. See *People v. Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 55 (a "diagnosis of schizophrenia was insufficient to support a finding that [the defendant] was incompetent to conduct trial proceedings on his own, where he was not suffering from any hallucinations or paranoid delusions when he requested self-representation"). The record does not indicate whether or how defendant's mental illness affected

his ability to represent himself, nor does it reflect any symptoms that defendant experienced during proceedings in this case.

¶ 57    Furthermore, the question of whether defendant validly waived his right to counsel is different from the question of how effective he was at trial. When evaluating a defendant's request to proceed *pro se*, a court must consider only the defendant's "competence to *waive the right*" to counsel, not the defendant's "technical legal knowledge" about how to proceed at trial. (Emphasis in original.) *Godinez*, 509 U.S. at 399-400. It is not surprising that a *pro se* defendant struggled at trial against experienced ASAs. Many *pro se* defendants who do not suffer from mental illness would struggle as well. Just because a *pro se* defendant was not effective at trying his own case does not mean that he was incapable of waiving his right to counsel.

¶ 58    Defendant points to his claims at the April 2, 2021, hearing that he did not understand the sentencing ranges, the law, or anything that "ha[d] to do with" this case. However, at the April 28, 2021, hearing, defendant unequivocally stated that he understood each of the trial court's Rule 401(a) admonishments. These potentially conflicting statements did not invalidate defendant's waiver of counsel. Rather, they required the trial court to exercise judgment about which statements were true. The trial court was in a better position than we are to make that determination due to its familiarity with defendant and this case (see *Radojcic*, 2013 IL 114197, ¶ 34), and we will not reverse its determination that defendant did, in fact, understand the Rule 401(a) admonishments.

¶ 59    Defendant also argues that his behavior signaled to the trial court that he could not competently represent himself despite his claims to the contrary. When a defendant is " 'so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in

the courtroom,' " the trial court may be justified in imposing counsel upon him. *Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 44 (quoting *Illinois v. Allen*, 397 U.S. 337, 343 (1970)). But defendant's behavior did not rise to that level in this case. It is true that defendant sometimes acted in odd and inappropriate ways. For example, he sent an obscene letter to the ASA and presented the court with a letter falsely claiming that a relative of his, Antoinette Smithers, was a psychiatrist, when she was not any type of doctor. But at other times, defendant had a cordial relationship with the trial court. For example, at the April 2, 2021, hearing, defendant agreed that he and the trial court had "always been cool with each other," and at the April 28, 2021, hearing, defendant agreed that he and the trial court had "always gotten along." During closing argument, defendant said that the trial court judge was "a good judge" whom defendant "trust[ed]." Overall, defendant's demeanor throughout the proceedings was sufficiently controlled even though he was sometimes impatient and stubborn. Additionally, this trial was a bench trial, so there is no risk that defendant's behavior influenced a jury. The right to represent oneself is fundamental and trial courts must tolerate *pro se* defendants' "irritating, foolish, unprofessional, or occasionally wacky behavior." (Internal quotation marks omitted.) *People v. Rainey*, 2019 IL App (1st) 160187, ¶ 76. The record reflects that defendant's behavior was largely within those bounds, so his courtroom behavior was not a basis for denying his motion to represent himself.

¶ 60     To the extent defendant suggests that a defendant who intends to present an insanity defense must be represented by counsel, Illinois law does not impose such a rule. The statute that codifies the insanity defense does not require representation by counsel (720 ILCS 5/6-2(a) (West 2008)) and Rule 401(a) requires no admonishments about presenting a *pro se* insanity defense (Ill.

S. Ct. R. 401(a) (eff. Jul. 1, 1984)). It is up to our legislature to amend those statutes if doing so is warranted.

¶ 61    Defendant cites *Indiana v. Edwards*, 554 U.S. 164 (2008), for the proposition that a defendant can be competent to stand trial but not competent to represent himself. Individuals who fall into that category are sometimes called "gray-area" defendants. *Id.* at 173. However, *Edwards* holds only that "the Constitution *allows* States to insist upon representation by counsel for" "gray-area" defendants. (Emphasis added.) *Id.* at 178. Illinois does not have such a requirement and *Edwards* does not impose one. *Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 50 ("*Edwards* is permissive rather than prescriptive"); *People v. Allen*, 401 Ill. App. 3d 840, 852 (2010) ("[n]othing in *Edwards* requires a trial court to [engage in] the forced denial by the trial court of [the] defendant's right to proceed *pro se* although he was found mentally competent to stand trial."). Illinois case law provides that a court "*may* deny a defendant's request for self-representation *** where a defendant suffers from a severe mental illness and thus is not competent to conduct trial proceedings without counsel," ((emphasis added.) *Rodrigez-Aranda*, 2022 IL App (2d) 200715, ¶ 33), but not that the court *must* deny self-representation in that scenario.

¶ 62    Defendant also relies on *People v. Lego*, 168 Ill. 2d 561 (1995). In *Lego*, unrebutted testimony from two expert witnesses established that the *pro se* defendant suffered from mental illness that caused him to experience delusions that he had practiced as a lawyer for decades and that his legal skills were equal to or better than any attorney. *Id.* at 568-78. Our supreme court found that, considering the impact of the defendant's mental illnesses on his ability to judge his own legal skills, he could not validly waive his right to counsel. *Id.* at 577. By contrast, no expert witness in this case testified that defendant was unable to validly waive his right to trial counsel or

that he experienced delusions that his legal skills were the equal of experienced prosecutors. Defendant may have been overconfident and his decision to represent himself may have been unwise, but there is no indication that defendant actually believed he was an experienced trial attorney as the defendant in *Lego* did. Accordingly, we find that the trial court's acceptance of defendant's waiver of counsel was not an abuse of discretion.

¶ 63                                                      2. Standby Counsel

¶ 64      Defendant also briefly argues that the trial court should have appointed standby counsel. Standby counsel assists a *pro se* defendant " 'in overcoming routine procedural or evidentiary obstacles' " to goals such as introducing evidence or objecting to testimony. *Khan*, 2021 IL App (1st) 190679, ¶ 72 (quoting *People v. Gibson*, 136 Ill. 2d 362, 378 (1990)). Standby counsel can also help ensure compliance with courtroom protocol and procedure. *Id.* However, a *pro se* defendant does not have a right to standby counsel. *Id.* Rather, "a defendant who chooses to represent him or herself 'must be prepared to do just that' " without the assistance of standby counsel. *People v. Moore*, 2023 IL App (1st) 211421, ¶ 106 (quoting *Gibson*, 136 Ill. 2d at 383). When evaluating a defendant's request to appoint standby counsel, a court should consider the nature and gravity of the charges, the factual and legal complexity of the proceedings, and the ability and experience of the defendant. *Gibson*, 136 Ill. 2d at 380. We review whether the trial court erred in not appointing standby counsel for an abuse of discretion. *Id.*

¶ 65      Defendant does not apply the *Gibson* factors to this case, nor does he explain how the trial court's decision not to appoint standby counsel constituted an abuse of discretion. Defendant does not identify any evidence that he was unable to present or any of the State's evidence that he was

unable to exclude due to a lack of standby counsel. Accordingly, we find that the trial court's decision not to appoint standby counsel was not an abuse of discretion.

¶ 66                                    C. Guilty but Mentally Ill

¶ 67    Defendant next contends that we should remand for entry of a verdict of guilty but mentally ill.

¶ 68    The State argues that defendant forfeited this claim because he did not raise it at trial or in a posttrial motion. Generally, a defendant must object at trial and in a posttrial motion to preserve an error for review. *People v. McDonald*, 2016 IL 118882, ¶ 45. In closing arguments, defendant sought a verdict of not guilty by reason of insanity; he did not request a verdict of guilty but mentally ill as an alternative. Similarly, his *pro se* posttrial motion argued that he should have been "excused from criminal liability" due to his mental illness, *i.e.*, found not guilty by reason of insanity. Defendant's posttrial motion did not request a verdict of guilty but mentally ill either. Therefore, we agree with the State that defendant has forfeited this issue.

¶ 69    Nevertheless, defendant requests plain error review. As explained above, the first step of plain error review is to determine whether any error occurred. *Khan*, 2021 IL App (1st) 190051, ¶ 41. If it did not, then plain error cannot have occurred. *People v. Kitch*, 239 Ill. 2d 452, 465 (2011).

¶ 70    An insanity defense asserts that the defendant lacked the capacity to appreciate the criminality of his conduct due to "mental disease or mental defect." 720 ILCS 5/6-2(a) (West 2008). When a defendant raises an insanity defense, section 115-3(c) of the Code of Criminal Procedure of 1963 allows an alternative verdict of guilty but mentally ill. 725 ILCS 5/115-3(c) (West 2008). To reach such a verdict, the trial court must find that (1) the State proved the defendant guilty beyond a reasonable doubt, (2) the defendant failed to prove his insanity, and (3)

"the defendant has proven by a preponderance of the evidence that he was mentally ill, as defined in subsections (c) and (d) of the Criminal Code of 2012 at the time of the offense." *Id.* Mental illness as "a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior." 720 ILCS 5/6-2(d) (West 2008). "In ascertaining whether a defendant was suffering from a mental illness at the time of the commission of an offense, the trier of fact must weigh the totality of the evidence and determine the credibility of both lay and expert witnesses." (Internal quotation marks omitted.) *People v. Reed*, 209 Ill. App. 3d 575, 582 (1991).

¶ 71    A defendant found guilty but mentally ill "is not relieved of criminal responsibility for his conduct." 720 ILCS 5/6-2(d) (West 2008). A finding of guilty but mentally ill requires the Illinois Department of Corrections to conduct periodic examinations of a defendant's mental health and to provide treatment. 730 ILCS 5/5-2-6(b) (West 2008); see also *People v. Urdiales*, 225 Ill. 2d 354, 428 (2007). If the trier of fact returns a verdict of guilty rather than guilty but mentally ill, a reviewing court will reverse that determination only if the verdict is so improbable or unsatisfactory as to raise a reasonable doubt about the defendant's mental illness at the time of the offense. *People v. Dresher*, 364 Ill. App. 3d 847, 856 (2006).

¶ 72    A verdict of guilty but mentally ill is available only when a defendant presents an insanity defense. *People v. Adamcyk*, 259 Ill. App. 3d 670, 678 (1994) (citing *People v. Gosier*, 145 Ill. 2d 127, 142 (1991)). All defendants are presumed sane and, to raise an insanity defense, a defendant must present some evidence of insanity. *People v. Wood*, 2014 IL App (1st) 121408, ¶ 75. In this case, defendant sought a verdict of not guilty by reason of insanity, but we question whether he

actually presented an insanity defense. Defendant called no expert witnesses and no witness testified that defendant was legally insane at the time of the offenses. The only expert witness, Dr. Echevarria, opined that defendant was legally sane. Given that no one presented evidence of defendant's insanity, we are skeptical that the verdict of guilty but mentally ill was even available to the trial court.

¶ 73    Assuming a verdict of guilty but mentally ill was available, the question is whether the manifest weight of the evidence established that defendant was mentally ill *at the time of* the offenses on October 25, 2009, and whether such mental illness impaired his judgment. See 720 ILCS 5/6-2(d) (West 2008); 725 ILCS 5/115-3(c) (West 2008). On those issues, the evidence was sparse. Defendant testified that he heard voices telling him to kill on October 25, 2009, and his mother's testimony suggested that he sought mental health treatment earlier that year. However, no expert witness testified that defendant was mentally ill on October 25, 2009, or that mental illness affected his judgment that day. See *People v. Johnson*, 146 Ill. 2d 109, 132-33 (1991) (verdict of guilty but mentally ill not warranted when no expert testified that the defendant was mentally ill at the time of the offenses). Furthermore, no expert witness testified that defendant was diagnosed with or treated for mental illness before October 25, 2009. The medical records that defendant presented are silent about his mental health prior to 2011. Defendant's brief ignores this fact and vaguely claims that medical records from 2011 and 2012 show that he "had previously been diagnosed with severe mental health issues." Prior to trial, yes. Prior to the offenses, no.

¶ 74    Moreover, defendant's claim that "voices" compelled him to stab Fias and B.M. was undermined by his flight from the scene, disposal of his clothes and knives, and attempt to escape to Sauk Village. Those actions suggested that defendant understood that he had committed serious

crimes and was trying to flee. See *People v. Wiley*, 185 Ill. App. 3d 1097, 1107 (1989) (the defendant's alleged mental illness was "belied by" his attempt to conceal the stabbing he committed). The trial court's conclusion that defendant was guilty and that he did not prove mental illness at the time of the offenses was not against the manifest weight of the evidence.

¶ 75    Defendant claims that "the State's own medical expert, Dr. Echevarria, testified [defendant] was mentally ill at the time of the offenses." That is incorrect. Dr. Echevarria opined that defendant was legally sane based on "the absence of the objective documentation *** supporting the presence of significant symptoms of a mental disease or defect at that time." Dr. Echevarria expressed no opinion as to whether defendant was mentally ill when he stabbed Fias and B.M. because there was nothing to base such an opinion on.

¶ 76    The cases that defendant cites are distinguishable and do not compel reversal. In *People v. McCullum*, 386 Ill. App. 3d 495 (2008), this court affirmed the trial court's rejection of the defendant's insanity defense and, in turn, upheld the trial court's verdict of guilty but mentally ill. *Id.* at 508. *McCullum* does not discuss what justifies *replacing* a guilty verdict with a verdict of guilty but mentally ill, which is the outcome defendant seeks in this case. Moreover, in *McCullum*, there was "no dispute that [the] defendant *** had been diagnosed with mental illness well before the shooting." *Id.* at 507. In this case, there was some evidence that defendant sought mental health treatment before traveling to the Chicago area in 2009, but it was unclear whether defendant had, in fact, been diagnosed with a mental illness prior to October 25, 2009.

¶ 77    *People v. Gurga*, 150 Ill. App. 3d 158 (1986), is distinguishable. Although this court reversed the trial court's guilty verdict and ordered entry of a verdict of guilty but mentally ill (*id.* at 168), the evidence of mental illness in *Gurga* was much more robust than in this case. In *Gurga*,

expert witnesses for both parties "submitted considerable evidence showing that defendant was suffering from a substantial disorder of mood or behavior which impaired his judgment." *Id.* at 167. In addition, the State's expert testified that the "defendant had suffered from a mental disorder for many years," and "numerous psychiatrists" documented the defendant's "extensive history of emotional problems." *Id.* By contrast, in this case, no expert witness testified that defendant suffered from mental illness on October 25, 2009, or that he had an extensive history of mental health issues prior to stabbing Fias and B.M. Accordingly, we find no error and affirm the trial court's findings of guilt.

¶ 78                                           D. Sentence

¶ 79     Finally, defendant challenges his 63-year sentence and requests that we reduce it to "the 26-year statutory minimum." Although defendant frames this argument as a challenge to the sentence as "excessive," he actually raises two different arguments, neither of which is a typical excessiveness claim. First, defendant contends that the trial court improperly increased his sentence from 58 years to 63 years on remand. Second, defendant suggests that his *de facto* life sentence violates *Miller v. Alabama*, 567 U.S. 460 (2012), and related authority.

¶ 80     The State argues that defendant forfeited these issues because he did not raise them in the trial court. We agree. "Normally, any sentencing issues not raised in a motion to reconsider the sentence are forfeited." (Internal quotation marks omitted.) *People v. McBride*, 395 Ill. App. 3d 204, 208 (2009). Defendant did not file a motion to reconsider sentence, so the trial court had no opportunity to address these issues. See *People v. Johnson*, 2024 IL 130191, ¶ 40 (forfeiture rule exists to encourage defendants " 'to raise issues before the trial court, allowing the court to correct its own errors.' ") (quoting *People v. Herron*, 215 Ill. 2d 167, 175 (2005)).

¶ 81    Defendant's reply brief makes a perfunctory request that we review these issues for plain error as well. He contends that first-prong plain error occurred because "the evidence was at least close regarding whether [he] was mentally ill at the time of the offenses" and second-prong plain error occurred because his sentencing hearing was unfair "where the trial court failed to consider [his] mental health in the proper context." Defendant cites no authority that supports reviewing his claims of sentencing error for plain error and does not develop these arguments, so this portion of his reply brief does not comply with Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). Therefore, defendant has forfeited his request for plain error review of sentencing issues. See *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010); *People v. Sprind*, 403 Ill. App. 3d 772, 779 (2010).

¶ 82                                III. CONCLUSION

¶ 83    For the foregoing reasons, we affirm defendant's convictions and sentence.

¶ 84    Affirmed.